Louise H. EDWARDS et al., Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 16042.

United States Court of Appeals Fifth Circuit.

March 14, 1957.

George W. Ericksen, Chester H. Ferguson, Tampa, Fla., Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., of counsel, for petitioners.

Davis W. Morton, Atty., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, John Potts Barnes, Chief Counsel, Internal Revenue Service, Rollin H. Transue, Sp. Atty., Internal Revenue Service, Harry Baum, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before RIVES, TUTTLE and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is a petition for review of six related decisions of the Tax Court in which the only issue here is whether petitioners' transferor's right to a pro rata share of "unabsorbed premiums" of a mutual insurance company accrued to the transferors during its final, shortened fiscal year before its dissolution, or at some later date.

The pertinent facts are as follows:

On September 19, 1944, the Growers Mutual Insurance Company (GMIC) was organized as a mutual insurance company under the insurance laws of Florida. Its organizers, officers, policyholders, etc., were all relatives or business associates of the petitioners, then stockholders of the Dixie Groves Company. The pertinent provisions of the GMIC by-laws relating to its reserves, Art. VI, §§ 3, 4, provided that all income, in the form of premiums or otherwise, would constitute (1) first a fund for the payment of claims for loss or damage; (2) second a fund for operating expenses and for the creation of such reserves as required by law or regulation or by the judgment of the directors; (3) whenever such reserves in the judgment of the directors became excessive a distribution was to be made to the policyholders, proportional to the premiums they had paid. Also:

"Whenever a member of the company shall cease to be a member thereof, all unabsorbed premiums remaining in the company or in the different classes thereof applying to policies held and premiums paid by such retiring member shall be returned to the retiring member and all interest of the retiring member in the reserve and surplus of the company shall thereupon terminate.

"Section 4—All funds of the company, over and above the amounts necessary to pay the debts of the company shall and do belong to the members of the company and on dissolution of the company, the same shall be distributed to the members of the company pro rata in proportion to the payment of premiums which said members shall have made to the company."

The first year 29 policies were written for the period October 20, 1944—September 1, 1945, assuming a total risk of $760,932 against loss from frost for premiums of $253,644. Dixie Groves was issued Policy No. 3 for a premium of $52,600, and Dixie reported this amount as an expenditure on its tax returns for the fiscal year September 1, 1944—August 31, 1945.

On August 31, 1945, the Balance Sheet of GMIC showed "Policyholders' reserve" at $248,269.22, of which Dixie Groves' pro rata share was $51,544.13.

On September 18, 1945:

(1) The stockholders of Dixie Groves met and decided to liquidate and dissolve the company, all assets and liabilities to be transferred to the stockholders in un-

divided shares proportional to the stock ownership.

(2) Thereupon the directors of Dixie Groves met and passed the resolutions necessary to implement the desire of the stockholders.

(3) The directors of GMIC also met and amended the above quoted portion of Art. VI, § 3, of the by-laws to provide that a retiring member would be paid his interest in the reserve in five annual installments, the first to be paid one year after the expiration of the member's last policy unless a different arrangement was made by agreement between member and company. It was also resolved that reserves be set up on the books of the company and that all the net earnings of the previous year be carried into that reserve, to be entered on the books in the names of the members according to the interest of each. At about that time the company had been advised by the Insurance Commissioner of Florida to establish a minimum reserve of $100,000.

On September 19, 1945, Dixie Groves transferred all of its property to its stockholders, here the petitioners, by means of several instruments.

On September 24, 1945, the individual stockholders transferred their undivided interest in the property received from Dixie to the Triple E Development Company, a corporation that had been the largest stockholder in Dixie and was also largely owned by some of the petitioners. On that day Triple E entered on its books an asset described as "a/c Growers Mut. Ins. Co.—$50,000.00."

Some days later the president of Triple E directed an oral request to an officer of GMIC that it be paid the "unabsorbed premiums" due to Dixie. This was the first semi-official notification to GMIC that Dixie had gone out of business though, because of the close relationship of the officers of the several organizations, the officials of GMIC were probably fully informed of the status of Dixie.

On October 6, 1945, the directors of GMIC adopted a resolution to the effect that: "due to the fact that Dixie Groves Company was now out of business, that they be paid in cash their equity in the policyholders' reserve."

Pursuant to this resolution and on the same day a payment of $45,000.00 was made to Triple E, in part payment pending the annual audit of the GMIC books.

Dixie's final taxable period ended on November 10, 1945, according to the later determination of the Tax Court, originally hotly contested by the petitioners but now conceded. (Thus their final fiscal year was September 1, 1945–November 10, 1945.)

On December 14, 1945, after its audit, GMIC paid $6,544.13 to Triple E, in complete payment of the unabsorbed premiums due to Dixie.

On March 29, 1946, the stockholders of Dixie signed a written consent of dissolution which was filed on April 24th and resulted in an issuance of a dissolution certificate on June 6, 1946.

During the year following the payment to Triple E several other members withdrew from GMIC, but payments to them were made in installments as provided for by the amended by-laws; on December 30, 1946, however, lump sum payments were made to four "previous policyholders."

In its final income tax return (for the period September 1–November 10, 1945) Dixie Groves did not report any portion of the $51,544.13 received by Triple E; the Commissioner now attempts to assert a deficiency against petitioners, Dixie's immediate transferees. As appellants state it, the only issue here is:

"Did Dixie Groves Company's equity of $51,544.13 in the reserve and surplus of Growers Mutual Insurance Company constitute income to Dixie Groves Company on the accrual basis in its taxable period which began September 1, 1945."

On this point the Tax Court held:

"The insurance year for which the premium had been paid expired on

September 1, 1945, and the facts supplying the basis for computing the unabsorbed premium were fixed and determined and there is no showing or contention that there were any claims remaining under the policies which were in dispute or yet to be determined * * * On the facts here present, we conclude and hold that the unabsorbed premium of $51,544.13 had accrued prior to the liquidation of Dixie Groves, and was income to it in its taxable period beginning September 1, 1945."

Petitioners argue that the unabsorbed premiums did not accrue to them on September 1, 1945, or at any time within their final tax period because:

(1) Certain formal steps had to be taken to fix the right of Dixie to receive its portion of the reserves within that tax period: (a) withdrawal (or dissolution) from GMIC; (b) demand for its equity; (c) action thereon by the GMIC Board of Directors and a determination by them that payment should be made at once rather than over a five year period.

(2) Until a withdrawal was accomplished and payment of the unabsorbed premiums actually made, or the obligation to do so finally fixed, the former policyholder's portion of the reserves would still be liable for paying any losses or expenses of the insurance company, even though the (ex)member is then no longer subject to assessment. This is asserted to be required both by the by-laws of GMIC and as a matter of Florida law.

The Commissioner answers these points:

(1) The "formal" requirements:

a. Petitioners' reliance on the amended by-laws of September 18, 1945, which provided for payment over a period of five years instead of immediately, is misplaced since such a retroactive enactment could not change the substance of any rights that had accrued on September 1, 1945.

b. The consent of the GMIC directors was a mere formality, especially in view of the close business relationship among all the parties.

c. Actually no postponement of payment was caused by the by-laws since the entire amount was paid within three months, $45,000 before the November 10, terminal date of Dixie's tax period and the rest before dissolution became final on June 6, 1946. Other withdrawing members were similarly treated.

2. Other claims against the reserves (or Dixie's portion thereof):

a. The Tax Court found that on September 1, 1945, there were no claims remaining or disputes to be settled under any of the policies.

b. Policies were issued for only one season, and members were not subject to assessment for any year in which they were not policyholders.

The parties do not greatly differ as to what constitutes an accrual of income for tax purposes. Petitioners refer to Internal Revenue Cumulative Bulletin LO. 1086 I–1, 87, as follows:

" * * * in order to be accruable in the taxable year for which a return is made, a valid right to income must have arisen or existed in that year, which is enforceable on the date the income is due. If, however, the right to an amount is contingent upon the happening of some future event, there is no certainty that it will be paid or will accrue. In this event no income accrues from a fixed and determinable source, and no right to anything arises or exists in the taxable year which can be accounted for as income under any system of accounting."

They also quote Mertens' Law of Federal Income Taxation:

"Items may and must be accrued as income when the events occur which fix the amount due and determine the liability to pay. It is commonly stated that an item should be accrued when (1) all the events have occurred which fix the amount of the

claim and determine the question of liability; (2) the amount is readily ascertainable; and (3) the liability therefor is determined rather than contingent. But the exact amount need not be determined; it is sufficient that all the facts upon which the calculation depends have become fixed. * * * Obviously the right to receive cannot become fixed prior to the time the payor becomes obligated to pay." Sec. 12.76.

The Goverment prefers the statement in the opinion of the Court of Appeals for the Ninth Circuit in H. Liebes & Co. v. Commissioner, 90 F.2d 932, at page 938:

"* * * income accrues to a taxpayer, when there arises to him a fixed or unconditional right to receive it, if there is a reasonable expectancy that the right will be converted into money or its equivalent."

The point of disagreement here between the parties is whether on September 1st, when the policy year expired, Dixie was immediately entitled to claim all of the unabsorbed balance of its premium then shown on the books of GMIC as Dixie's pro rata share of "policyholder's reserve" of $51,544.13, or whether this pro rata part was subject to be withheld pro rata part was subject to being withheld by GMIC as a reserve for future losses in subsequent policy years. It is undisputed that there were no losses from the current year.

Most significant in determining which view is correct is the fact that on September 1st the directors of GMIC had not acted to create any reserve as they may have been entitled to do under the by-law quoted above. At that time, therefore, the only funds on hand were in the nature of "unabsorbed premiums." As to these amounts the by-laws required that they be refunded upon termination of membership. Also highly significant is the actual course of dealing between the parties. It is inconceivable that if the directors of GMIC really understood that the unabsorbed premiums for the "frost" year 1944–45 were subject to being held as a reserve for losses incurred by future policyholders in later years they would have voluntarily voted to release the entire amount to Dixie's assignee as they did on October 8th.

There is nothing in the record that expressly provides for the retention of the surplus funds from one year for the benefit of policyholders in future years except the provision permitting the directors to set up reserves. The fact that they did not do so prior to the termination of Dixie's policy and membership and the fact that they ignored their own installment payment requirement 40 days later fully justifies the Tax Court's finding that:

"The insurance year for which the premium had been paid expired on September 1, 1945, and the facts supplying the basis for computing the unabsorbed premium were fixed and determined and there is no showing or contention that there were any claims remaining under the policies which were in dispute or yet to be determined."

Undoubtedly a system of insurance could be arranged whereby all policyholders would engage to protect their own and each other's interest as against the dangers of successive years' frost. It was equally permissible however for them to pool funds for a single year to protect the single or several policyholders whose groves might be damaged without any concern for future frost hazards. In light of the reference in the by-laws to the withdrawal by a policyholder of the "unabsorbed premiums," (as contrasted with "reserves" or "surplus") upon termination of membership, and in the light of the action of the directors in paying out the entire amount to Dixie's successor without reserving any part of it for future losses, it is quite apparent that it is was an annual undertaking that was in existence on September 1st rather than a continuing one. Upon the termination of the year's policy Dixie became immediately entitled to its refund under

the precise terms of the by-laws then in effect. This right could not be thereafter unilaterally modified by the GMIC when it amended the by-laws to provide for permissive retention of the funds over a five year period.

The decision of the Tax Court is affirmed.